All rise. Illinois Public Court Third Division is now in session. Your Honor, Justice Maryanne Mason is presiding. Good morning. Please have a seat. And can we call the first case, please? 14-0785, People v. Tyrell, Gibbs. Will the attorneys please approach? Good morning. Sarah Stout, S-A-R-A-H-S-T-A-U-D-T, of Lawndale Christian Legal Center, on behalf of Petitioner Tyrell Gibbs. Also on behalf of Petitioner Cliff Nellis, N-E-L-L-I-S, from the Lawndale Christian Legal Center. All right. And then Serena Powell, first name spelled C-Z-A-R-I-N-A, Powell, on behalf of People. All right. Good morning. Thank you. We have one case on our call this morning. We don't, our panel generally doesn't strictly enforce time limits. But how much time would you like to argue? When I prepped, 20 minutes was what I ended up with. About the same. All right. And I'll tell you that we have all read the briefs. We're very familiar with the case. And so you can keep that in mind as you're presenting your argument. The microphone in front of you is not for amplification. It's for recording purposes. So if you would keep your voices up during your arguments, that would be great. All right. Ms. Stout? May it please the Court. My name is Sarah Stout, from Lawndale Christian Legal Center, on behalf of Petitioner. Your Honor, at the trial court level, Tyrell Gibbs was deprived of relevant, crucial evidence to present to the jury. Evidence the Illinois courts have held is key to the decision of guilt and self-defense. This happened in three major ways. First, the trial judge denied a continuance to secure witnesses after significant disclosure of discovery from the State's attorney, both on the weekend before trial and then on the day of trial. But on the Lynch issue, the defense had Mr. Winter's rap sheet early on, right? This is true, Your Honor. And what really happened in this case was a shift in what the State's case was against our client, such that it required a shift in defense strategy. How did we shift? Well, on the Friday before trial, which the trial was scheduled for Tuesday, the co-defendant in this case pled. What that meant was that rather than going into trial with our defendant and a fully corroborating co-defendant, we instead were going into trial with just our defendant against the complaining witness. It turned from a two-against-one case to a one-against-one case. But you answered ready even after Tamisha Hord's pled guilty. We answered ready on Friday on the day of Tamisha Hord's plea. However, on Sunday, the situation complicated further. Although we had subpoenaed both inventory slips and photographs of our defendants, there were more photographs that were tendered to us first on Sunday. But your defendant knew this from day one. Well, Your Honor, the issue was not so much what our defendant knew, but whether he would be undermined at trial. So when we went in with our discovery, including multiple subpoenas that covered this material, there were no photographs mentioned of either Tyrell Gibbs or his girlfriend Tamisha Hord. Therefore, the only testimony that would have come out at trial about the extent of their injuries would have been the police's testimony and our client's testimony. Our client's testimony would have been that his injuries were, in fact, significantly more severe than they were in the pictures. For that reason, on Sunday and on Tuesday, we discovered that our case was further undermined. What relevance are the pictures, anyway? Well, the pictures showed basically, we also have pictures in the case, of course, of Mr. Winters. Now, Mr. Winters' injuries were depicted as quite severe. The injuries depicted in the evidence recognition photos showed only injuries that were on Mr. Gibbs' hands. And, in fact, the State used this in their opening argument, describing him as a prize fighter. It was clear that they were using these pictures to show that he was, in fact, the first aggressor, that he was the aggressive person, and that his injuries and Tamisha Hord's injuries were minor. But he knew what his injuries were. Well, Your Honor, the evidence recognition photos did not show or did not have close-ups of, for example, the injuries that he testified to on his head, that, in fact, he said were significantly more severe. It also didn't have any body bruising. For that reason, if there had been no pictures, we would have had two conflicting testimonies, the officer's memory and Tyrell's memory. He could have said whatever he wanted to. Of course, but the point that we reached was that after the disclosure of this evidence, our case was significantly weakened. And as soon as we realized how weakened it was, we withdrew our demand for trial and immediately requested a three-week continuance with a clearly delineated plan of how we were going to obtain more evidence, obtain our lynch witnesses, and be ready for trial in three weeks. However, even though this was the first continuance we had ever sought, it was denied. And I think the record shows, Your Honor, that the reason it was denied was because we had demanded trial. At every point when the trial judge brought up our bases for continuance, he noted that we had demanded trial. And this was simply not a case that's similar to cases like Fosslick, where you have somebody who's abusing the Speedy Trial Act, which is essentially what the trial judge seems to have based his denial of continuance on. But he still gave you a few days. He gave us a two-day continuance, Your Honor. But we should have been able to find your witnesses in that time. Well, Your Honor, we had given the trial judge a fully mapped-out plan of what we needed to do to find those witnesses. By Tuesday, we already had. How many witnesses were you going to find? Well, by the time we, in fact, continued to do the work, by the time we had finished that three-week period, we had found a report in Hoffman Estates, which would have been combined with a police officer who would have been able to testify, a complaining witness named Sherry Mason, who indicated her willingness to testify. She was the domestic battery. Yes, Your Honor. By which you get no affidavit to support you. Although we didn't have an affidavit, we did include our investigators' notes in our motion for a new trial. That's irrelevant. Well, I mean, at the point that we were at in the motion for a new trial, we simply wished to show the judge that had the continuance been granted, we would have found a witness that was willing to testify, not so much that we had the evidence in play at the moment of the motion for a new trial. Obviously, if we had been granted a new trial, we would have brought Ms. Mason in. So at that point, we knew, we took this three-week period to prove it. I mean, what difference would it be if you brought her in than the stipulated evidence that was brought in? Well, the problem with the stipulated evidence, Your Honor, was first, of course, that only one piece of evidence was ever brought in. In fact, Mr. Winters had a long history of arrests, although not prosecutions, for various kinds of violent acts, including some, like the Hoffman Estates issue, in which he, in fact, had a very similar MO to what we were accusing him of doing in this case, impersonating a Chicago police officer. But under Lynch, if it's an arrest, you have to bring in live testimony. Yes. You can't just cross-examine a victim about an arrest record. Right. So you would have had to bring in live testimony to substantiate any of the other. Yes, Your Honor, and that was exactly the issue that we found ourselves faced with. An unusual situation where a person with a long violent history actually only has one conviction. And so this was the additional problem with our second issue, the bringing in of that one conviction only through stipulation and not through live testimony. But you didn't, and he reads it in, though. Well, I did want to point out as I, you know, looking at Lynch's response to this. I mean, to me, this sounds like one of two things, either an attorney who was sloppy or an attorney that thinks he's cute. So what happened in terms of the stipulation was that we had originally asked that we be able to bring in the conviction through a motion in limine. On the day of trial, the state then responded to that motion in limine, bringing up two points. And this is an M9 to M11 of the common law record, of the transcript, if you're interested. The state asked first that we not be able to bring in the testimony until after we had put on evidence of self-defense. And second, that we only be allowed to bring it in through stipulation. We then responded to their motion and said both that it was basically, it would be faster to simply bring it in in the case in chief. The judge agreed. It did not require us to recall. And second, that Lynch, that the basis of Lynch requires that we do be able to cross-examine and bring in the underlying facts that surround the conviction in order to prove violent character. And on that point, the judge denied us and refused to allow us to cross-examine him. Now, we did read the stipulation into evidence because it was our evidence in the end, the only evidence that we were entitled to. But by no means did we agree to the fact that it should go in by stipulation. In fact, we specifically argued at length that we should be able to cross-examine. We had removed him post-trial. If you were cross-examining Mr. Winters on the 14-year-old domestic battery involving his former girlfriend, and he said, I don't remember, I don't recall, no, it didn't happen that way, then you're stuck because you don't have the victim to come in. And so you're stuck with the stipulation. I'm trying to envision how cross-examining Mr. Winters on the underlying offense would have changed the outcome. Well, Your Honor, in the case as it proceeded, there was no evidence other than this dry stipulation of any violent character from Mr. Winters, which vastly misrepresented who Mr. Winters was. We could have asked questions about where it took place, what their relationship was, what the kind of battery was. And yes, of course, it's possible that Mr. Winters would have denied it and we would have ended up in the same place. But because we weren't allowed, and the jury would have been able to judge his credibility in denying that conviction. But because we weren't allowed to cross-examine, we didn't get to get into any of those issues and that key information about first aggressor, and I remember that this is a two witness case in which both are claiming that the other was the aggressor. We instead had no live testimony as to the violent character of Mr. Winters after the denial of the continuance and the proceeding by stipulation. Given that the state also had no evidence against our client, that contrast was lost. Instead, it seemed that both men had come in with essentially clean records except for the stipulation, and that is an inaccurate picture of what happened here. That was going to be true whether it was two witnesses against one or one against one because the self-defense and the pursuit of lynch evidence didn't take place until the day of trial. That's true, yeah. But in picking our strategy, the reason that as the two against one case was different was because, and this gets into this hearsay issue that we also bring up, that we believed that the case was strongest because those two co-defendants had such strongly corroborating stories, and in fact had them right after the event. They corroborated each other on key details, and we had no reason to believe that they would have deviated given that account and the relatively unbelievable account of Mr. Winters, an account that indeed the jury showed that it had some doubts on by ruling not guilty on the armed robbery. The case changed significantly. But isn't, you know, you bring that up, the jury found your client not guilty on armed robbery. To me, that says, because Mr. Winters' testimony was, this guy comes up behind me with a brick and hits me in the head. That's his first encounter with your client. So the not guilty on armed robbery tells me the jury believed your client, that Winters was the aggressor. And the jury question on what is the permissible use of force in connection with personal property not in your possession after it's been taken leads me to believe at least that the jury found that your client exceeded the permissible use of force by pursuing Winters after he had taken the phone and hitting him in the head with a brick. So that being the case, again, I'm trying to see how the complexion of the case would have changed. If you had brought in all this lynch evidence, yeah, he was the aggressor. But it still doesn't go to the offense that the jury found your client guilty of, and that is pursuing him and hitting him with a brick. Well, and of course, that, you know, going to our fourth point, Your Honor, that decision of whether pursuing and hitting him with a brick was or was not viable under self-defense is that pure question of law that I do believe that the jury ruled the way, decided the way that it did in part because their question was not answered by the judge. And therefore, they used the wrong law in determining that my client had, in fact, not had a right to self-defense at the time that he reclaimed the phone. And that question, I believe, is the one that is, I think, the clearest case for error in this case simply because it's so similar in its formulation to the situation in People vs. Falls, where basically, similarly, the jury sends out a question about the basic what is resisting an officer is does it have to be physical or can it be verbal. The judge refused to answer the question. The defense, like we did, presented an art, presented what they wanted the answer to be. The judge said no. The jury did not get the question answered. And then soon after, returned a verdict that was consistent with the raw view of the law. But trial counsel for the defense said, and I'm quoting, I have no problem with your instruction or your answer. Right. So where are you going with that? Well, Your Honor, we did first present our own answer to the question. We presented that we believe that the answer to the question should be yes, in fact. The defense of property does extend even if the property has left your possession. However, the judge, after initially saying yes, in fact, that's what he should do, then changed his mind and said no. At that point, we lost the argument. He then went and gave his instruction to the jury, which was essentially no answer at all to your deliberations. Well, you've not only lost the argument, you're agreeing with what the judge is doing. Right. This is a little bit different. Well, Your Honor, I would simply note that at that point, we had already made our objection and our argument. It's our position that we did not waive that issue, in part because we had already brought up what we believed the answer should have been, and the state objected. At that point, objecting again would have been formulaic. But in addition, I do think that this qualifies under plain error. We know that this was likely the dispositive issue in the case. The jury asked the question only an hour before they made their decision. They ruled, as Your Honor noted, not guilty on the armed robbery, suggesting that they had believed the issue, the defensive mistake that we brought forward in that case, but that they weren't sure about the self-defense situation. And for that reason, it is likely that the jury used the wrong law. And because of that, convicted my client when, under the law of Illinois, he had an affirmative right to self-defense. What should have happened in this case is that the judge should have, and jurors have the right to have their questions answered in Illinois. But, you know, self-defense, when you say this is a question of law, whether someone is entitled to use force in self-defense always depends on the facts and circumstances. And here, you had a context where the evidence showed the perpetrator, Winters, was running away. He had the phone, he had Tamisha Hord's phone, and he's running away. And so is it the law that someone can pursue that person and use the force that your client did to get his property back? It's not in his or his girlfriend's possession any longer. Well, Your Honor, we would note, first of all, that the one fully on-point case, which is the Fifth District case, Swartz does say that, yes, you know, for example, in a purse snatching case, you can run after somebody and reclaim your property. But more importantly, Your Honor, I would note that that question is not a factual question. It's a legal question. The question of whether or not you're allowed to do that is a question of law, which is the purview of the judge. You can reclaim it with a brick to the head? Well, it would be up to the jury to decide whether the brick to the head was the force he was using to reclaim the property or the force he was using to defend against himself once that altercation started again. It's probably true that deadly force is not an option. But by the time the brick was used, Tyrell was clearly testifying that they were on the ground and he was losing the fight with hands around his neck. So at that point, he was being threatened with his life. The question the jury seemed to be asking is, at that moment of pursuit, when he decides to run after him in the first place, is he entitled to a defensive property? And at that point, that's a question of law. And a question of law that, indeed, the jury asked very clearly as a question of law and not a question of fact. And because of that, and because of their right to have their questions answered, this was a clear mistake of law, where the jury has used the wrong law in this case to make their decision. So, Your Honor, briefly, I'd like to touch on the last issue, which again goes to that issue of whether the co-defendant could testify. We did believe, too, that because we were not allowed to bring in any information about the fact that the police received two consistent accounts and one non-consistent account, the jury was misled about what occurred in this investigation, and we should have had the chance to undermine that investigation. That would get in prior consistent statements in an untold number of cases. Well, Your Honor, it would simply be our position that what we were asking for, even if it had gone in with a limiting instruction, for example, simply noting that the statements were consistent and key facts, would not go anywhere beyond what the State is already allowed to do in many cases where they bring an investigative procedure, including situations where the State has been allowed to bring in This is an investigative procedure? Well, it would be our position that when the police were faced with a position where they had three people, all of whom were accusing each other of crimes, and they decided to arrest two of them and not one, the jury should be entitled to know about why they made that decision. But even if you don't believe that that situation is relevant in this case, the jury question and the lack of continuance meant that in the end, the jury both did not have the full facts of this case to make a decision and was not proceeding on the correct law to make this decision. And for that reason, if there are no more questions, I would simply ask that the case be remanded and that a new trial be granted. Thank you. All right, Ms. Powell? May it please the Court, Assistant State's Attorney Serena Powell, on behalf of the people. Do me a favor and keep your voice up. I've got issues here. In regards to counsel's issue number one, the trial court properly exercised its discretion in denying defendant a three-week continuance. In this case, the trial court gave its exact reasoning for why it had denied the defendant a three-week continuance on February 20, 2014. In its decision, this trial court cited not just in light of the defendant's prior demands for trial, it also listed the fact that the defendant had asserted from its answer to discovery on January 9, 2014, that it was asserting the affirmative defense of self-defense. And at that juncture, back in January, the defendant had every opportunity to seek out lynched evidence from its very, the inception of its assertion that the defendant was going to be asserting this defense of self-defense. But what's the State doing producing discovery on the Sunday after the case was set for trial? Your Honor, the prosecutor in this case did tender evidence the Sunday prior to trial. This trial was set for Tuesday, that Tuesday. But it was originally set for Friday. Correct. The State wasn't ready, had represented that all discovery was complete, and then Sunday there are pictures of the defendant in inventory. Correct. Your Honor, first the State would argue that the evidence that was tendered, this was no surprise to the defendant. The defendant was on notice about the items that were tendered the Sunday before trial. In regards to the inventory reports, these were inventory numbers were listed in the arrest reports themselves. The defendant was always on notice back when that was tendered, the arrest reports, that these were items that were recovered on the defendant the day he was arrested. These are items that were recovered on the defendant's person, and the defendant had notice of the cell phones that were recovered on him on the day that he was arrested. In addition, the defendant was fully on notice and had every opportunity to know what injuries he suffered the day that he was arrested. Furthermore, they were listed in the arrest report. It specifically stated that the defendant suffered injuries to his arms and his hand, so therefore counsel was also on notice that the injuries depicted in these photos that were tendered were injuries that counsel and defendant already knew that the defendant sustained. Let me ask you, counsel raises the change in what occurred by the co-defendant pleading guilty. Can you go into your response to their assertion that that really makes a difference when my gut is what difference does it make because she probably wouldn't have been able to testify favorably anyway? Correct. The state would assert that the defendant and the co-defendant from the get-go were represented by different counsels. There was no guarantee to the defendant that the co-defendant would not assert her right to Fifth Amendment rights to stay silent at trial, and there was no guarantee that the co-defendant would testify favorably for the defendant. Furthermore, in light of the co-defendant pleading guilty, the defendant had originally requested trial for December 14, 2014. The defendant had requested a bench trial. The counsel then stated, in light of the co-defendant pleading guilty, he was now going to request a jury trial, and instead of proceeding by agreement because the state and the defense were not ready on that day, defense counsel decided to take the case, motion state, for four more days to count against the spitty trial term so that four days later, on February 18, 2014, it would proceed to jury trial to accommodate this new change in circumstance. So in terms of the co-defendant pleading guilty, that was already accounted for on the day that counsel requested, changed from a bench trial to request a jury trial. Regarding the lynch information, just to reiterate, the defendant, in its answer to discovery on January 9, 2014, asserted from the get-go that he was asserting the affirmative defense of self-defense. Once the defendant has asserted that, he is completely able, and from that point forward, able to search out and investigate the victim's criminal history. Defense counsel admitted to the trial court that they had, from the very beginning, the victim's arrest history. And this was quite an extensive arrest history. It listed not just the convictions, but also the defendant's arrests. From that point where they had the defendant's arrest history in their possession, they were able to go out and conduct lynch investigations. It should not have taken them to February 20, 2014, for them to commence their lynch investigation, as they had asserted self-defense from way back in January. What about the, they do come up with the domestic battery conviction. And why is it that, because self-defense is an issue, the defendant should have to proceed by way of stipulation, and can't even ask the victim, who was convicted of domestic battery, anything about that conviction? So first, the defense counsel was not forced to go along with a stipulation. Defense counsel could have objected. Defense counsel could have decided, instead, to enter a certified copy of conviction into the trial. In terms of live testimony versus a stipulation, there was no proper means by which the defense counsel could have gotten out of the victim the specific facts of his domestic battery conviction, without the ability to prove up questions that he asked. So if, for example, counsel had gone in and asked the victim about specific instances, specific examples of this domestic battery conviction, and the victim, for example, lied or said no, there was no way for them, they did not have the victim of the victim in court, for them to impeach the victim, or for them to prove up any allegations or assertions that they would come out through this cross-examination. Further, it is not the proper, questioning the victim about his domestic battery conviction, prior to there being a foundation or an assertion that self-defense was an issue, that is not the correct procedure in which to question, that is not the correct procedure in which to get out the information that the victim was the aggressor. First, there would have to be some foundation that the defendant would have to... So, this was mentioned in the opening argument. Your theory is that where self-defense is at issue, in the state's case, nothing comes out about the background of the alleged victim, because, of course, self-defense won't come up until the defendant's case, and then we have to wait for, do we recall the victim in the defendant's case? So this is an issue that was addressed in Lynch itself at 204. It asserted that in order for the victim's character to properly be admitted, evidence about the victim's violent character, there has to first be some evidence provided by the defense as to who was the first aggressor. So, per Lynch, that is the correct procedure in order to get in the victim's violent character. However, in this case, under these particular circumstances, the defense counsel was able to question the victim about his violent and aggressive character in terms of his recent warrant for arrest in Minnesota for aggravated battery. They were able to get in in front of the jury, before the defense's case in chief, information and evidence that the victim had this violent history. So, in terms of what Lynch requires, first the defense putting on its case, in this case, the victim's violent character came in during the state's case in chief. In regards to Issue 3, the trial court did not err by denying the defendant's motion to eliminate, to allow the defense to cross-examine the police officers regarding the hearsay statements made to them by the defendant and the co-defendant. Hearsay is inadmissible at trial, and while defense counsel attempted to allow in this hearsay through the investigatory course of conduct exception, that exception does not allow in the actual statements of witnesses to the police officers during the course of their investigation. The only thing that the investigatory course of conduct allows in is testimony by the police officers to explain how they went from point A to point B, point A being they spoke with a witness, point B being they took a subsequent action. Even when the state attempts to invoke this exception, the state is not, the state, the defense, no party is allowed to elicit from the police officers the hearsay that was said to them by witnesses in conducting their investigation. Furthermore, it was asserted by trial counsel that a second reason that this information, the particular statements made to the officers should come in, was to figure out what set of information the police had at their disposal, given that this was self-defense, and they wanted the jury to know what information the police officer had when he decided who to believe. As the trial court correctly noted in his ruling that these statements would not come in, that is the jury's function. That is the purview of the jury to decide the veracity of the witnesses, to decide if the police officers believed the correct person or not. It was not the purview of the police officers themselves to state who they believed and who they didn't believe in conducting their investigation. And what about the jury question on the defense of property? Is it an issue of law? We would argue that this question, under the circumstances of this case, was a question of fact. The specific question was, there were several questions the jury sent back. This was the fourth question. This question at issue was, once property is no longer in the possession of the defendant, is the defendant justified to use force to re-obtain this property, or is it just when the defendant is in possession of that property? We would argue that this is not merely a question about the defendant defending his property. It is also a question of possession. And it is ultimately the jury's decision to decide when that possession begins and when it ends. And it was correct and it was not error for the trial court to ultimately refuse to answer this question and to leave it up to the jury as to whether they would choose to decide which set of facts they believed in terms of whether the defendant was justified in using force to obtain the property that was legally in his possession or not. It is within the trial court's discretion to properly decline the jury's answer if the jury question involves a question of fact. And if the jury question, if the court were to answer the jury question, it would be likely that the court would express an opinion that would direct the jury one way or the other. Upon initial glance at this question, defense counsel wanted the answer to be yes and the state wanted the answer to be no. The court initially was going along with the yes answer. And upon further reflection, we would argue, realized that this question, one, was a question of fact, asking when the defendant lawfully was in possession of the phone or not when he decided to use force. And secondly, the trial court realized if it answered yes or no, it would be directing the jury one way or the other. Furthermore, the defendant was not prejudiced by the trial court refusing to answer this question. And defense counsel did have the jury read the instruction of IPI 24-25.08, which read that a person is justified in the use of force when and to the extent that he reasonably believes that such conduct is necessary to prevent another's wrongful interference with personal property lawfully in his possession. So the trial defense counsel did, and the jury did receive this instruction about defensive property. So they had instructions before them that would have allowed them, if they believed the defendant, the defendant's chain of events, that would have allowed them to find the defendant not guilty not just of the armed robbery but of the aggravated battery. Instead, they chose to acquit the defendant of the armed robbery and convict him of the aggravated battery. And it was not error for the trial court to deny answering this question. It was not an abuse of discretion. Thank you. Anything further? Thank you. For these reasons and for the reasons stated in our brief, we respectfully ask you to affirm the defendant's conviction for aggravated battery. Thank you. All right. Let's stop briefly. Yes, Your Honor. I just wanted to briefly respond to a couple of points. The first was the question of notice regarding the late-tendered evidence. We had, in fact, sent three subpoenas for this evidence and had not received that from the State. We had received responses to those subpoenas from the State but had not received this evidence. I think the point is you knew you didn't have it. You knew there was an inventory number and that you didn't have the inventory listing. Well, there are two issues. The first is that we included this in our motion for a new trial. It's in the record. Our version of the arrest report actually did not note that photographs had been taken of the defendant. Our version of the arrest report read photographs, colon, with a blank. The State's version of the arrest report did not. And that was something that we brought out in our motion for a new trial and in our motion for a continuance. And, in fact, we were not on notice that those photographs existed due, apparently, to an error by the Chicago Police Department. In addition, Your Honor, although we did have those inventory numbers listed, we had already sent multiple subpoenas that asked for every inventory number in the case. And, frankly, Your Honor, the question of whether the State, asking the defense to comb through the State's evidence in order to find any possible surprises undermines the idea that the State should have open discovery channels and should be tendering over anything they intend to use at trial in a timely fashion. And, Your Honor, there was essentially no sanction imposed because we were denied this continuance for the fact that the State had tended this discovery actually after the date of trial and that they had tended some of that discovery on the Sunday of a long weekend and then that they had tended the rest on the morning. When you say there was no sanction, it probably didn't take the form of a sanction, but Judge Coghlan did continue the trial, which was scheduled to commence on the 18th, and you ultimately started, I think, on the 21st? That's correct. And so if the defendant knew what was in his possession when he was arrested, he had the phones in his pocket and they were taken from him, and he certainly knew booking photographs were taken of him. Doesn't a two- or three-day continuance accommodate that late disclosure? Well, Your Honor, our position would be that the combination of that plus the plea of the co-defendant, which I'll address in a moment, together substantially weakened our case because, again, the question is not what Tyrell did or did not know or what he would and would not testify to. It's what the State's going to be able to impeach him with that is going to end up being the evidence that the jury sees. And similarly, to your point, Your Honor, the question of whether the co-defendant's plea really changed anything, given that we didn't know how she was going to testify, in this case, because of the strong, independent, of the prior statements by both Tyrell and Tamisha Hoard, we did know that no matter how she testified, we would have a strong, prior, and consistent statement, consistent with our claims. But what if she elects not to testify? Well, in that case, Your Honor, we had spoken to counsel, and we did have reason to believe that Ms. Hoard did intend to testify. We had reason to believe from her counsel that had it gone to jury trial, she did intend to testify. But more importantly, we, in any case, would have been in the same position that we were in. But the question of as soon as she fled, not only could she not testify, but there was no way that we would be able to bring out any corroborating evidence and that instead it would be a one versus one case. I also wanted to turn to the question of the stipulation, and particularly the warrants, and note that although we were allowed to bring in the warrants, they were being used for bias and not for lynch material. In fact, those warrants were not for final convictions. We wouldn't have been able to use them for lynch material. We were only able to use them to question, basically, to try and undermine the idea that perhaps the victim was scared about his warrants in another case and was therefore biased. So those were not used as lynch material. This jury knew what the warrants were for. They did. They did, Your Honor. But again, we were not allowed to go into that same cross-examination we would have wanted for the conviction that was stipulated to, to ask about the underlying facts of the offense. The only thing we were able to ask about was the existence of the warrant and what it was for. And lastly, Your Honor, in terms of the jury question, we would note that after we had given our proposed response to the question, and the judge had decided against us, we then simply agreed with the phrasing of the question. I do believe that we have agreed with the phrasing, I'm sorry, of the judge's final answer to the jury. We already explained to the judge that we did not agree with the substance. So while I understand that on the record it appears that there was a statement that we agree, we had previously already said that we didn't agree. And there's no reason to believe from the record that we were doing anything other than agreeing with the phrasing, which is what we were doing. At that point, we frankly already lost. And lastly, Your Honor, I'd simply note that given the amount of time we were on the case, the request for a three-week continuance with clearly delineated plans for how we were going to find this information and the hiring of a private investigator was a reasonable request asked for in good faith, and that allowing that would have preserved the ability of the defense to have counsel of its choice and a strategy of its choice. Because we were denied that continuance, we were embarrassed by being unable to effectively present the strategy and the defense that we intended to present once the state had violated discovery rules and given us late-tenured evidence. And for those reasons, we believe that we were denied that continuance for unreasonable reasons. There was an abuse of discretion because the reason the judge denied that continuance is because we had demanded trial. And frankly, there was enough time left on the trial clock. There were still months left on the trial clock, three months left on the trial clock. And all of the cases about continuances and questions of abuse of speedy trial happen once you're actually trying to dismiss the case for lack of speedy trial to avoid that mockery of justice that, of course, we would worry about if someone was demanding and then withdrawing and demanding and withdrawing. But in fact, this was the first continuance the defense had ever sought, thanks in part to the fact that our client had been very clear that he wanted this to move quickly. It was the first continuance we had ever sought after only being on the case for three months. For that reason, we believe that it's clear from the record that the reasons for the denial of this continuance were unreasonable because they unfairly punished us for our decision to demand trial and then once withdraw thanks to late, tender discovery and the plea of the co-defendant. For that reason, we would ask that you reverse the decision of the trial court or demand for new trial. Thank you very much. Thank you for your briefs and your excellent arguments here this morning. We will take the matter under advisement.